IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-65

No. COA20-458

Filed 16 March 2021

Wayne County, No. 17 JA 62

IN THE MATTER OF: J.C.-B.

Appeal by respondent from order entered 16 March 2020 by Judge Ericka Y. James in Wayne County District Court. Heard in the Court of Appeals 24 February 2021.

> *E.B. Borden Parker for petitioner-appellee Greene County Department of Social Services and White & Allen P.A., by Delaina Davis Boyd, for custodian (joint brief).*
>
> *Parent Defender Wendy C. Sotolongo, by Assistant Parent Defender J. Lee Gilliam, for respondent-appellant.*
>
> *Poyner & Spruill, LLP, by John Michael Durnovich and Christopher S. Dwight, for Guardian ad Litem.*

TYSON, Judge.

¶ 1 Respondent-mother appeals from a trial court order awarding custody of her son, Jacob, to his maternal grandmother ("Grandmother"), and eliminating visitation and reunification with Jacob from her permanent plan. *See* N.C. R. App. P. 42(b)(1),(b)(4) (permitting the use of pseudonyms to protect the identity of the child). We vacate and remand.

## I.    Background

Respondent-mother attempted suicide and was involuntarily committed. Respondent-mother was discharged after spending a week in the hospital. Wayne County Department of Social Services ("DSS") alleged her son, Jacob, who was thirteen-year-old at that time, to be neglected and dependent. DSS petitioned for nonsecure custody, and Jacob was placed with his maternal grandmother on 26 April 2017.

DSS maintained Jacob's placement with Grandmother after Respondent-mother's discharge. Jacob was adjudicated neglected and dependent on 31 August 2017. After the disposition hearing, legal custody was continued with DSS and Jacob's placement was continued with Grandmother.

The permanent plan was set as reunification with Respondent-mother. Reunification remained the sole permanent plan at the 8 February 2018 review hearing. A permanency planning hearing was scheduled for April, 2018.

At the 5 April 2018 permanency planning hearing, permanent custody of Jacob was awarded to Grandmother and reunification efforts with Respondent-mother were ceased. The juvenile court's jurisdiction over Jacob was converted to a civil custody action by order filed 7 June 2018. Respondent-mother appealed the order and soon thereafter moved to Texas.

This Court unanimously vacated the 7 June 2018 order in its entirety and

remanded by opinion filed on 26 March 2019. This Court held:

> [T]he trial court must conduct a hearing before entering a permanency planning order. This Court has held that the language of the statute requires live testimony at the hearing; the court cannot rely solely on "the written reports of DSS and the guardian ad litem, prior court orders, and oral arguments by the attorneys involved in the case." *In re D.Y.*, 202 N.C. App. 140, 143, 688 S.E.2d 91, 93 (2010). Accordingly, we vacate the trial court's permanency planning order and the corresponding order terminating juvenile court jurisdiction, and we remand this case for further proceedings.

*In re J.C.-B. I,* 264 N.C. App. 667, 828 S.E.2d 676, 2019 WL 2528342 at *1 (2019)

(unpublished). The mandate issued on 15 April 2019.

¶ 7     While her appeal was pending, Respondent-mother initiated an email exchange with Jacob in February 2019. They conversed, and she cautioned him to avoid using drugs, smoking, drinking, and having sex. The mother and son took turns initiating and communicating through emails throughout 2019.

¶ 8     Dr. Kulikanda Chengappa ("Dr. Chengappa"), Jacob's psychiatrist, recommended that Jacob have "no physical contact with his biological mother at this time due to his unstable mental condition" on 11 July 2019. Five days later, DSS filed a motion for review and sought to eliminate Respondent-mother's parental rights to visit and contact Jacob. When the guardian *ad litem* ("GAL") visited Jacob on 24 July 2019, he reported that Jacob was "very relaxed[,]" and "doing well" at Grandmother's home. The GAL failed to report to the court Jacob's express wishes

regarding maintaining visitation and contact with his mother. The GAL recommended only for the therapist's advice to be followed.

¶ 9        The hearing on DSS' motion was held 1 August 2019. The trial court ordered Jacob and Respondent-mother to have no further contact, the order was filed and entered 27 August 2019.

¶ 10        Respondent-mother had emailed a birthday greeting to Jacob's two email addresses in late August 2019. On 24 October 2019, Jacob emailed Respondent-mother from his school account stating, "im (sic) going to make a new email so we can talk with out they seeing it they cant (sic) stop me from talking to my own mom[.]" They exchanged several emails that day. Respondent-mother also sent a Christmas message to both of Jacob's email accounts.

¶ 11        DSS prepared a reunification assessment on 2 January 2020. It stated "[s]trengths for the mother are employment, housing and use of community services." It stated needs as "mental health issues of [Jacob] and [Respondent-mother]." Joseph Brown ("Mr. Brown"), a new therapist, reported that Jacob was "a very emotionally intelligent young man" who "struggle[d] with a lot of anxiety" on 6 January 2020. Mr. Brown recommended that Jacob "be allowed to decide when he is ready to pursue a relationship with his mother rather than being required."

¶ 12        The trial court's hearing upon remand from this Court was not held until 30 January 2020, *over 10 months after* this Court's opinion in the prior appeal. In the

order, reunification was eliminated from the permanent plan. The trial court found Respondent-mother had mental health issues which prevent her from parenting. The court also found Respondent-mother was under order to have no contact with [Jacob], but the two had exchanged many emails. Custody of Jacob was granted to Grandmother, and Respondent-mother was forbidden from any contact with Jacob "until recommended by the juvenile's therapist." Respondent-mother again appeals.

## II.    Jurisdiction

¶ 13        Jurisdiction is proper pursuant to N. C. Gen. Stat. § 7B-1001(a) (2019).

## III.    Issues

A. Did the trial court err when it failed to make findings regarding Respondent-mother's constitutionally protected parental status and failed to verify the custodian's understanding of legal custody?

B. Did the trial court err in eliminating reunification from the permanent plan when Respondent-mother's case plan compliance and progress show that continued reunification efforts were likely to be successful and would promote health, safety and permanence for Jacob?

C. Did the trial court err when it left contact and visitation in the discretion of the therapist without considering Jacob's and Respondent-mother's wishes?

## IV.    Standard of Review

¶ 14        Prior to depriving parents of their natural and constitutionally protected rights of care, custody, and control over their minor child, "[a] trial court must determine by clear and convincing evidence that a parent's conduct is inconsistent with his or her protected status." *Weideman v. Shelton*, 247 N.C. App. 875, 880, 787 S.E.2d 412, 417

(2016) (internal quotation marks omitted).

> The clear and convincing standard requires evidence that should fully convince. This burden is more exacting than the preponderance of the evidence standard generally applied in civil cases, but less than the beyond a reasonable doubt standard applied in criminal matters. Our inquiry as a reviewing court is whether the evidence presented is such that a factfinder applying that evidentiary standard could reasonably find the fact in question.

*In re A.C.*, 247 N.C. App. 528, 533, 786 S.E.2d 728, 733–34 (2016) (alterations, citations, and internal quotation marks omitted).

The determination of parental unfitness or whether parental conduct is inconsistent with the parents' constitutionally protected status is reviewed *de novo*. *In re D.A.*, 258 N.C. App. 247, 249, 811 S.E.2d 729, 731 (2018). Under *de novo* review, the appellate court "considers the matter anew and freely substitutes judgment for that of the lower tribunal." *Id*. (alterations, citations and internal quotations omitted).

This Court "reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *Id*.

## V.   Analysis

## A. Respondent-Mother's Appeal

### *1. Fitness*

¶ 17 Respondent-mother argues that the trial court erred when it failed to make findings regarding her constitutionally protected parental status and failed to verify the custodian's understanding of legal custody. This Court recently and unanimously held:

> A natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child. A natural parent may lose his constitutionally protected right to the control of his children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is inconsistent with his or her constitutionally protected status. . . . To apply the best interest of the child test in a custody dispute between a parent and a nonparent, a trial court must find that the natural parent is unfit or that his or her conduct is inconsistent with a parent's constitutionally protected status.

*Id.* at 250, 811 S.E.2d at 731–32 (alterations, citations, and internal quotations omitted).

¶ 18 If the trial court fails to find the parent unfit or to have acted inconsistently with her constitutionally protected status, by clear and convincing evidence, a permanent custody award to a non-parent must be vacated. *In re B.G.*, 197 N.C. App. 570, 574, 677 S.E.2d 549, 552 (2009).

### a. *DSS' and Grandmother's arguments*

DSS and Grandmother concede the trial court did not find nor use the word "unfit," in its conclusion, but argue the order provided ample findings which may support "unfitness." DSS and Grandmother argue the trial court found that Jacob and Respondent-mother had lived in a car for a few days in an adjudicatory order filed on 6 September 2017.

At that time, the court also found Jacob occasionally forgot his keys, was locked out of his home and neighbors would give him water. The court further found Respondent-mother drove erratically, ran off the road, threw up and this had scared Jacob and found Respondent-mother attempted suicide because she had a "rotten" relationship with her girlfriend. The court identified Jacob has lived with Grandmother as his custodian since his mother's suicide attempt and found Jacob is afraid of Respondent-mother and wants her to be nicer.

DSS points out Jacob was diagnosed with post-traumatic stress disorder ("PTSD") and Respondent-mother has been treated in mental hospitals on more than one occasion, including once after a former girlfriend had committed suicide. DSS highlights Respondent-mother has cursed, made inappropriate comments to, and threatened to kill Jacob.

DSS and Grandmother rely on the order filed on 16 March 2020 wherein the trial court found: Respondent-mother testified she was receiving counseling and

medication in Texas, but none of her counselors have filed a report or responded when a drug screen was requested. They assert Respondent-mother has significant mental health issues that prevent her from being a good parent. Respondent-mother is under order to have no contact with Jacob, but she has emailed with him. The court again found Jacob lives with Grandmother, is stable and meets the diagnostic criteria of PTSD and ADHD.

¶ 23 Finally, DSS and Grandmother argue Respondent-mother moved to Texas in 2018, rather than working the case plan in North Carolina. DSS and Grandmother further assert it is not in Jacob's best interest to have any contact with Respondent-mother unless the therapist recommends it.

*b. Respondent-Mother's Arguments*

¶ 24 Respondent-mother argues Jacob was removed from her custody in 2017 when she was involuntarily committed due to an episode of mental illness which required inpatient treatment. At that time, Jacob was thirteen years old. No evidence tends to show Respondent-mother has suffered another episode, which required acute care or hospitalization. DSS had consistently reported that she was engaged in the services prescribed for reunification and was making steady progress.

¶ 25 Respondent-mother sought and received treatment for her mental health, and testified she was still engaged with treatment at the time of the order pending appeal. She visited Jacob when provided opportunities by the trial court and those visits went

well. Respondent-mother's counselor reported in April 2018 that she found "no barriers preventing [Respondent-mother] from parenting her child." Jacob is now seventeen years old.

¶ 26 Communicating with a child is not evidence to support a finding of unfitness or conduct inconsistent with a parent's constitutional rights. *Sides v. Ikner*, 222 N.C. App. 538, 549, 730 S.E.2d 844, 851 (2012) (examining the mother's "intentions and conduct" to determine if she "reasonably engaged" in the child's care under the circumstances).

¶ 27 Respondent-mother sought legal process to file a motion for contempt when Grandmother did not allow her to visit with Jacob. She answered Jacob's emails, as any caring parent would. She flew from Texas to North Carolina to attend counseling appointments and to see and visit with Jacob, even though she had been denied any access to her son by the Grandmother. She complied with the plan's requirements and goals DSS and the courts had placed upon her.

¶ 28 Respondent-mother resumed teaching third grade in the fall of 2017. No clear and convincing evidence or finding supports a conclusion of unfitness or engaging in conduct inconsistent with her parental rights. The trial court erred in awarding custody to Grandmother without evidence or findings to conclude Respondent-mother was unfit or had acted inconsistently with her constitutionally protected parental rights. The court's order is again erroneous and must be vacated. *In re B.G.*, 197

N.C. App. at 574, 677 S.E.2d at 552; *see In re J.C.-B. I,* 2019 WL 2528342 at *1.

## 2. *Findings the Custodian Understands Legal Custody*

¶ 29        Respondent-mother argues the trial court failed to address Grandmother's understanding of the legal significance of becoming Jacob's custodian. When the trial court appoints a permanent custodian for a juvenile in a neglect and dependency case, "the court shall verify that the person receiving custody . . . understands the legal significance of the placement." N.C. Gen. Stat. § 7B-906.1(j) (2019). A permanent plan of custody order which does not contain the required verification must be vacated and remanded. *In re P.A.,* 241 N.C. App. 53, 65, 772 S.E.2d 240, 248 (2015). *But see In re J.E., B.E.,* 182 N.C. App. 612, 616-17, 643 S.E.2d 70, 73 (2007) (affirming guardianship order without specific verification findings).

¶ 30        DSS argues if the trial court erred by failing to verify such failure, such error is not prejudicial pursuant to N.C. Gen. Stat. § 7B-906.1(j), stating, "[t]he fact that the prospective custodian or guardian has provided stable placement for the juvenile for at least six consecutive months is evidence that the person has adequate resources." The trial court found on more than one occasion that Grandmother had been the caregiver for Jacob under DSS' placement since 26 April 2017. When Respondent-mother filed her brief for this appeal, Jacob had lived with Grandmother for more than 39 consecutive months, far exceeding the six consecutive months in the statute. Respondent-mother filed a motion for contempt after Grandmother refused

to allow her to visit with Jacob.

¶ 31 Under N.C. Gen. Stat. § 7B-906.1, if a "custodian or guardian has provided stable placement for the juvenile for at least six consecutive months is evidence that the person has adequate resources," but such evidence does not *per se* compel a conclusion that the "person receiving custody . . . understands the legal significance of the placement." N.C. Gen. Stat. § 7B-906.1(j). During continuing months at a time, Respondent-mother was not allowed to communicate with or to visit her child.

¶ 32 DSS and the trial court unexplainedly delayed re-convening the hearing *for over ten months* after Respondent-mother's previous successful appeal, and then only to violate her constitutionally protected parental rights yet again. *In re D.A.* 258 N.C. App. at 250, 811 S.E. 2d at 731-32; *see In re J.C.-B. I*, 2019 WL 2528342 at *1.

## B. Compliance with Reunification Efforts

¶ 33 This Court reviews the order to cease reunification:

> [to] consider whether the trial court's order contains the necessary statutory findings to cease reunification efforts. Under our statutes: "Reunification shall remain a primary or secondary plan unless the court made findings under G.S. 7B-901(c) or makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b) (2017). Here, the trial court failed to make findings under N.C. Gen. Stat. § 7B-901(c) (2017). The court could only cease reunification efforts after finding that those efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.

*Id.* at 253, 811 S.E.2d at 733–34.

### *1. Statutory Requirements*

¶ 34        Specific evidentiary findings must show:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d) (2019).

¶ 35        The court shall not cease reunification efforts without supported findings and conclusions those efforts would be unsuccessful or inconsistent with Jacob's health or safety. *In re D.A.,* 258 N.C. App at 253, 811 S.E.2d at 733-34. Neither the trial court's 16 March 2020 order nor DSS' evaluation provide evidence to support findings specifically addressing any of the statutory factors of section 7B-906.2(d).

¶ 36        The court's findings included: Jacob's therapist's belief he needs to remain with Grandmother; Respondent-mother testified she was receiving counseling, but did not file a report and has not provided a signed release to her counselors; Respondent-mother is taking four medications for headaches, mood and anxiety; she has significant mental health issues and emailed her son in violation of a court order; and

Jacob stated he is now "bigger and stronger" than his mother. These findings, even if true, do not support a conclusion to eliminate reunification under the statute. N.C. Gen. Stat. § 7B-906.2(d). The trial court's order does not state adequate findings to support its conclusion to cease reunification efforts. *Id*.

### 2. *Futile Efforts*

¶ 37        DSS and Grandmother argue, "[t]he language of Section 7B-906.2(b) seems plainly to provide that a trial court, in any permanency planning hearing, can omit reunification as a concurrent plan if it determines that reunification efforts are either futile or contrary to the juvenile's well-being." *In re M.T.-L.Y.*, 265 N.C. App. 454, 462, 829 S.E. 2d 496, 502 (2019). DSS argues Respondent-mother failed to visit Jacob for more than a year, moved to Texas, and failed to file regarding visitation with Jacob until after DSS' motion to suspend her visitation had been granted on 1 August 2019. Finally, DSS argues Respondent-mother has not provided evidence of her mental health counseling in Texas.

¶ 38        The transcript and record show DSS' witnesses answered "yes" to questions of whether Respondent-mother was "actively participating in or cooperating with the plan, DSS, and the guardian ad litem[.]" DSS' witnesses also answered "yes" to the question of whether Respondent-mother "remain[ed] available to the court, DSS, and the guardian ad litem[.]" DSS' witnesses further answered "no" to the question of whether Respondent-mother was "acting in a manner inconsistent with the health or

safety of the juvenile[.]"

¶ 39    No evidence tends to show Respondent-mother was abusing prescription medications, having mental health breakdowns, or was involved in unhealthy relationships for nearly three years after Jacob was removed from her care. Her limited communications and visits with Jacob were described as appropriate, warm, and affirming.

¶ 40    The social worker further testified Respondent-mother had maintained stable employment as a third grade teacher and housing. Respondent-mother testified she regularly attended therapy and medication management appointments and named her physicians. There were no positive tests for illegal substances.

¶ 41    A finding and conclusion that reunification efforts would be unsuccessful or inconsistent with Jacob's health, safety and need for a permanent home is unsupported by clear and convincing evidence and does not meet the mandatory requirements of N.C. Gen. Stat.§ 7B-906.2(b).

### 3.  *Reasonable Efforts*

¶ 42    "[A]t each permanency planning hearing the court shall make a finding about whether the reunification efforts of the county department of social services were reasonable." N.C. Gen. Stat. § 7B-906.2(c) (2019). For DSS' reunification efforts to be "reasonable" under the Juvenile Code, they are statutorily required to be "diligent." N.C. Gen. Stat. § 7B-101(18) (2019).

¶ 43        Regarding DSS' "reasonable efforts" at reunification with Respondent-mother,

the trial court found DSS had:

> a. Maintained contact with and visits with the juvenile in
> the home of the grandmother;
>
> b. Collateral contacts with the therapist, the In Home
> Program, and reviewed ECU Neurology reports;
>
> . . . .
>
> d. Contact with the mother.
>
> e. Permanency Planning reviews;
>
> f. Completed strengths and needs assessment and a
> reunification assessment and determined that the risk to
> the juvenile if returned to the mother remains high due to
> a poor relationship between the juvenile and the mother.

¶ 44        DSS' contacts with Jacob in the relative placement were to determine whether

Jacob was being cared for in that placement. Their actions were not aimed at

reunifying him with his mother.  The collateral contacts were similarly aimed at

monitoring Jacob's well-being where he was, not to achieve the goal of reunification.

Contact with Respondent-mother, reviews, and assessments are undoubtedly an

important part of monitoring progress towards reunification  Nothing in the record

indicates concrete action steps or that timelines were established from the contacts,

reviews, and assessments, to reunify Jacob with Respondent-mother.

¶ 45        DSS made no "diligent" or substantial efforts towards reunification in the more

than 10 months between this Court's decision in *In re J.C.-B. I* in March 2019 and

the hearing in January 2020. DSS never requested its social services counterpart in Texas to assess Respondent-mother's home in Texas, even after reunification was reinstated as the permanent plan with this Court's mandate in April 2019. Three months after this Court vacated the prior unlawful order eliminating reunification, DSS successfully moved the trial court in July 2019 to completely cut off all of Respondent-mother's contact with Jacob, even so far as not letting her answer his emails. The record does not show the statutorily required efforts by DSS to support reunification were "diligent" and reasonable. N.C. Gen. Stat.§ 7B-101(18). These statutorily required efforts were arguably non-existent. *See id.*

## C. Visitation at Discretion of Jacob's Therapist

¶ 46      To deny visitation, the trial court must make material findings sufficient enough to support and conclude a parent has forfeited her right to visitation or by findings the parent-child contact is not in the child's best interest. *See In re Custody of Stancil*, 10 N.C. App. 545, 548, 179 S.E.2d 844, 848 (1971). Fifty years ago, this Court stated:

> When the custody of a child is awarded by the court, it is the exercise of a judicial function. In like manner, when visitation rights are awarded, it is the exercise of a judicial function. We do not think that the exercise of this judicial function may be properly delegated by the court to the custodian of the child . . . To give the custodian of the child authority to decide when, where and under what circumstances a parent may visit his or her child could result in a complete denial of the right and in any event

would be delegating a judicial function to the custodian. *Id.* at 552, 179 S.E.2d at 849. Ten years ago, this Court re-stated and re-affirmed, "the trial court must set the parameters of visitation[,]"and should not leave visitation in the discretion of another person, including a "treatment team" or therapist. *In re D.M.*, 211 N.C. App. 382, 388, 712 S.E.2d 355, 358 (2011).

¶ 47 At each permanency planning hearing, the trial court must consider information from the GAL and from the juvenile. N.C. Gen. Stat. § 7B-906.1(c) (2019). This statutory provision is consistent with long-standing case law holding a trial court has a duty both to ascertain and consider the child's preference in custody determinations. *Mintz v. Mintz*, 64 N.C. App. 338, 341, 307 S.E.2d 391, 394 (1983).

¶ 48 The trial court is not required to abide by a child's express wishes, but the child's wishes are part of the totality of circumstances the trial court must consider, and consider those wishes more particularly as a child approaches majority. *See Bost v. Van Nortwick*, 117 N.C. App. 1, 9, 449 S.E.2d 911, 916 (1994).

¶ 49 One of the duties of a GAL is to ascertain from the child they represent what their wishes are and to convey those express wishes accurately and objectively to the court. *See* N.C. Gen. Stat. § 7B-601(a) (2019). Jacob's wishes as an older teen were never sought nor conveyed to the trial court.

### 1. *Statutory Violations*

¶ 50 When an appellant argues the trial court failed to follow a statutory mandate,

the error is preserved, and the issue is a question of law and reviewed *de novo*. *See In re E.M.*, 263 N.C. App. 476, 479, 823 S.E.2d 674, 676 (2019). Specifically, violation of N.C. Gen. Stat. § 7B-601, the statute listing the GAL's duties, or N.C. Gen. Stat. § 7B-906.1(c), the statute listing the evidence to support requirements at a permanency planning hearing, requires reversal and remand for a new hearing. *In re R.A.H.*, 171 N.C. App. 427, 432, 614 S.E.2d 382, 385 (2005).

## 2. *Jacob's Wishes*

Jacob was sixteen years old at the time of the permanency placement hearing under appeal. He was old enough to petition for emancipation, and well past the age when a juvenile's wishes regarding his own placement and associations must be considered. N.C. Gen. Stat. § 7B-3500 (2019).

The only recent indication in the record of Jacob's wishes came from an email he sent his mother on 24 October 2019 stating, "im [sic] going to make a new email so we can talk with out they [sic] seeing it they cant stop me from talking to my own mom[.]" Jacob's express wishes are missing from the only GAL report in July 2019 prepared after this Court's remand, and six months before the January hearing. The GAL did not communicate Jacob's wishes to the court and apparently simply deferred to the therapist's opinion.

The GAL presented letters from service providers, including two that were identical to previous letters except for the date. One of those letters, from Dr. Paul

Brar in October 2018, was based on examinations in September 2017 and August 2018. It stated, "[i]n my professional opinion in the best interest of Jacob he should not be allowed to have visitation even contact with the mother."

¶ 54       The GAL presented two letters from Timothy Hunt ("Mr. Hunt"). Mr. Hunt, a therapist hired by Grandmother, provided identical letters except one was dated 1 December 2018 and the other was dated 14 July 2019. Mr. Hunt's assessment was based upon observations he made from October 2017 to May 2018. Mr. Hunt recommended that Jacob's "contact with his mother [be] limited to when [Jacob] would like to make contact with her. . . I would ask the court that [Jacob] be allowed to decide when he would like to pursue a relationship with his mother rather than being required."

¶ 55       The GAL presented a letter, written by Dr. Chengappa on 11 July 2019, which referred to treatment "since 2012." Dr. Chengappa recommended "[i]t is my professional opinion that [Jacob] should have no physical contact with his biological mother at this time due to his unstable mental condition."

¶ 56       The only rationale the therapists' letters supply is in Mr. Hunt's letter, "[Jacob] is sensitive and struggles with anxiety . . . mother's behaviors are erratic and cause him a lot of internal conflict." No statements support an order to forbid visitations or contact between Jacob and his mother.

¶ 57       Further, the information provided by the GAL was several months old by the

time of the January 2020 hearing. The information from both Mr. Hunt and Dr. Brar was over a year old. Dr. Chengappa's information was more than six months old.

¶ 58 The most current information, a letter from Jacob's current therapist, Mr. Brown, which was attached to the DSS report, recommended that Jacob "be allowed to decide when he is ready to pursue a relationship with his mother."

¶ 59 The therapists' opinions are divided on whether Jacob should be reunited or be allowed visitation with his mother, but the most recent recommendation is to allow Jacob to decide. The record also shows Jacob's expressed desire and efforts to maintain contact with his mother, which was not communicated to the court by the GAL. Why Jacob was not called and permitted to testify is suspiciously missing from the record. Jacob is now seventeen years old, eligible for emancipation and his opinion carries great weight. *See* N.C. Gen. Stat. § 7B-3500.

## VI. Conclusion

¶ 60 Our Supreme Court held, "this Court has enunciated the fundamental principle that absent a finding parents, (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care, and control of their children must prevail." *Adams v. Tessener*, 354 N.C. 57, 60, 550 S.E.2d 499, 501 (2001) (citation and quotation marks omitted).

¶ 61 The trial court erred by granting custody to Grandmother in derogation of Respondent-mother's constitutional rights as a parent without finding her to be unfit

or engaged in conduct inconsistent with her parental rights. The trial court also erred by eliminating reunification with Respondent-mother without making proper findings of fact after multiple reports and testimony from DSS' witnesses affirming Respondent-mother's compliance with the plan.

Finally, the court erred when it made contact between Jacob and his mother contingent on the therapist's recommendation without knowing and considering Jacob's wishes. *In re D.M.*, 211 N.C. App. at 388, 712 S.E.2d at 358 (the trial court must set the parameters of visitation[,] and should not leave visitation in the discretion of another person, including a "treatment team" or therapist.).

For these reasons, the order is vacated and again remanded with instructions for immediate entry of an order consistent with this Court's opinion as contained herein. This mandate shall be effective upon filing. *It is so ordered.*

VACATED AND REMANDED.

Judges COLLINS and WOOD concur.